UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Eric Stephen Southgate,

      Plaintiff,

      v.                         Civil Action No. 2:14-cv-166-wks-jmc

Carolyn W. Colvin, Acting Commissioner
of Social Security Administration,

      Defendant.

## REPORT AND RECOMMENDATION
(Docs. 9, 15)

Plaintiff Eric Southgate brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).  Pending before the Court are Southgate's motion to reverse the Commissioner's decision (Doc. 9), and the Commissioner's motion to affirm the same (Doc. 15).  For the reasons stated below, I recommend that Southgate's motion be GRANTED, in part; the Commissioner's motion be DENIED; and the matter be REMANDED for further proceedings and a new decision.

## Background

Southgate was 46 years old on his amended alleged disability onset date of September 8, 2010.  He dropped out of school at age 15 or 16 and obtained his GED at age 17.  (AR 47, 1303.)  He has worked as a chef, a carpenter, and a construction worker.

(AR 48.)  He never married and has no children.  (AR 1302.)  He lives alone and sees his father and sister regularly.  (*Id.*; AR 49, 67.)

As a child, Southgate was abused and neglected by his alcoholic parents, resulting in him being placed in a group home at age 16, around the time when his parents divorced. (AR 1302–03, 1546.)  He started abusing alcohol at age 11 or 12, adding marijuana, cocaine, and LSD soon thereafter.  (AR 1303.)  Southgate continued to use drugs and alcohol as an adult.  (*Id.*)  He has been admitted into several alcohol and drug treatment residential programs, and has participated in alcoholics anonymous in the past.  (AR 1306.)

In 2007, Southgate suffered a shoulder injury, resulting in shoulder surgery in 2008. (AR 53–54.)  In 2009, he suffered two heart attacks, which were treated with two separate stent procedures to the right coronary artery.  (AR 353–55, 365–67, 401–02).  As a result of these injuries, Southgate continues to experience shoulder pain and fatigue.  Southgate also suffers from chronic neck and low back pain, stemming from the cervical and lumbar spine impairments spondylosis (degeneration of the spine) and spondylolisthesis (a forward or backward slippage of one vertebra on an adjacent vertebra).  (*See, e.g.*, AR 984, 989, 1058, 1479, 1494–95, 1497, 1563.)  He has tried physical therapy, epidural steroid injections, acupuncture, and many different types of medications, including narcotics, to address his chronic pain.  (AR 50, 58.)  He has found, however, that the only methods effective at reducing his pain and having minimal side effects are acupuncture and daily marijuana use. (AR 58–59, 62, 1304.)  Apparently linked to his physical impairments, particularly his chronic pain, Southgate also suffers from depression.  (*See, e.g.*, AR 428.)

2

In February 2012, Southgate filed applications for SSI and DIB, alleging disability beginning on November 28, 2007[1].  (AR 52, 242–52.)  In his disability application, Southgate alleged that he stopped working on the alleged disability onset date because of the following conditions, along with "other reasons" (AR 276): heart attacks in 2008 leaving him with "permanent heart damage," a "broken neck," a traumatic brain injury resulting from a 1992 motorcycle accident, depression, chronic pain, high cholesterol, arthritis in the shoulders, degenerative disc disease, and a 1992 collar bone injury (AR 275).  In a February 2012 Function Report, Southgate stated that "[e]verything and anything causes [him] increased pain and discomfort"; that he "can't stand[,] sit, walk, drive, or d[o] anything for any length of time"; and that he is in "constant pain."  (AR 295.) Southgate further stated that, on a typical day, he does no more than let the dog out and in, drink coffee, take his medications, sit in his recliner chair, and l[ie] down.  (AR 296.)  He explained that some days, he drives to visit his father and attempts to walk; but he "get[s] very tired and weak" and "the more [he] tr[ies] to d[o] physically, the more pain [he's] in." (*Id.*)  He added that his neck hurts "all the time" and he sometimes has numbness and weakness in his hands.  (*Id.*)

Southgate's application was denied initially and upon reconsideration, and he timely requested an administrative hearing.  The hearing was conducted on November 25, 2013, by Administrative Law Judge (ALJ) Thomas Merrill.  (AR 44–76.)  Southgate appeared and testified, and was represented by attorney Elaine Bodurtha.  A vocational expert (VE) also

---

[1]  At the November 2013 administrative hearing, Southgate amended his alleged disability onset date to September 8, 2010.  (AR 53.)

testified, along with Southgate's sister, Mary Therese Crete.  (AR 67–74.)  Crete stated that she sees Southgate daily, helping him with household chores and driving him to doctor appointments.  (AR 67–68.)  She further stated that she has observed Southgate having problems with walking, standing, and holding onto things, and experiencing "agonizing" back and leg pain.  (AR 69.)

On January 16, 2014, the ALJ issued a decision finding that Southgate was not disabled under the Social Security Act from his amended alleged disability onset date through the date of the decision.  (AR 24–36.)  Thereafter, the Appeals Council denied Southgate's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (AR 1–4.)  Having exhausted his administrative remedies, Southgate filed the Complaint in this action on August 4, 2014.  (Doc. 3.)

## **ALJ Decision**

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her

impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Merrill first determined that Southgate had not engaged in substantial gainful activity since his amended alleged disability onset date of September 8, 2010.  (AR 27.)  At step two, the ALJ found that Southgate had the following severe impairments: degenerative disc disease of the cervical spine status post fusion, depression, and intermittent chest pain.  (*Id.*)  Conversely, the ALJ found that Southgate's traumatic brain injury, shoulder injury, heart problems, arthritis, high cholesterol, and obstructive sleep apnea, were not severe, given that none of these conditions limited

Southgate's functional capacity. (*Id.*) The ALJ also found that, despite a January 2013 medical opinion stating that Southgate had a "significant substance addiction disorder" and was a "high-risk opioid patient," the record did not support functional limitations attributed to substance abuse, and thus Southgate's drug addiction or alcoholism was "not material and not severe." (*Id.*) Next, despite the ALJ's earlier statement that Southgate's depression was a "severe" impairment (*id.*), the ALJ stated that depression "does not cause more than minimal limitation in [Southgate's] ability to perform basic mental work activities[,] and is therefore nonsevere" (AR 28).

At step three, considering Listings 1.02 (major dysfunction of a joint) and 1.04 (disorders of the spine), the ALJ found that none of Southgate's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 29.) Next, the ALJ determined that Southgate had the RFC to perform "light work," as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), except as follows:

> [Southgate] can occasionally climb ladders, ropes, and scaffolding. [He] can occasionally reach overhead. [He] is able to understand, remember[,] and carryout one[-] to three[-]step tasks; concentrate, persist[,] and pace for two-hour periods throughout a typical work day and work week; manage routine changes in tasks, be aware of hazards, travel, and plan and set goals.

(*Id.*) Given this RFC, the ALJ found that Southgate was unable to perform his past relevant work. (AR 34.) Based on testimony from the VE, however, the ALJ determined that Southgate could perform other jobs existing in significant numbers in the national economy, including the representative occupations of price marker, order caller, and cafeteria attendant. (AR 35–36.) The ALJ concluded that Southgate had not been under a disability

6

from the amended alleged disability onset date of September 8, 2010 through the date of the decision.  (AR 36.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

## I.      Step-Two Finding Regarding Severity of Back Pain and Depression

Southgate contends that the ALJ erred at step two of the sequential analysis by failing to make a finding regarding the severity of Southgate's back pain, and by making inconsistent findings regarding the severity of Southgate's depression.  In response, the Commissioner asserts that substantial evidence supports the ALJ's assessment of Southgate's impairments at step two, and any omissions or inconsistent statements the ALJ may have made are harmless error.  I find that Southgate's arguments are meritorious, and further, that the ALJ's errors are not harmless and require remand for further proceedings and a new decision.

### A.      Legal Standard

The claimant bears the burden at step two of the sequential process to establish that his or her impairment is "severe," meaning it "significantly limit[s] [his or her] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a); *see* 20 C.F.R. § 404.1520(c).  Despite this strong language, the step-two severity assessment "may do no more than screen out *de minimis* claims."  *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) (citing *Bowen v. Yuckert*, 482 U.S. 137, 158 (1987)).  To that end, Social Security Ruling 85-28 provides: "A claim may be denied at step two only if the evidence

8

shows that the individual's impairments, when considered in combination, are not medically severe, i.e., do not have more than a minimal effect on the [claimant's] physical or mental ability(ies) to perform basic work activities." SSR 85-28, 1985 WL 56856, at *3 (1985). The Ruling further states: "An impairment or combination of impairments is found 'not severe' and a finding of 'not disabled' is made at this step when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." *Id.* (citing 20 C.F.R. §§ 404.1520, 404.1521, 416.920(c), 416.921); *see also* SSR 96-3p, 1996 WL 374181, at *1 (July 2, 1996).

### B.     Back Pain

Here, the ALJ considered many impairments at step two of the sequential analysis, determining that several were severe and many were non-severe, as listed above. (AR 27–28.) The ALJ made no mention, however, of Southgate's back pain. (*Id.*) This would not constitute a material error if the record contained only minimal evidence of this impairment and its debilitating effects on Southgate. But there is ample evidence in the record demonstrating that Southgate's back pain had more than a minimal effect on his ability to work during the relevant period. For example, Dr. Steven Rosmus, Southgate's treating primary care physician, included "[c]hronic back pain secondary to spondylolisthesis" as one of Southgate's diagnoses in a November 2013 Medical Source Statement (MSS) (AR 1569), and stated that Southgate "complain[s] of chronic cervical and lumbar discomfort with occasional radiation into one or both legs" (AR 1570). Moreover, Southgate testified at the administrative hearing that he suffers from back pain "[p]retty

much all the time" and that it interferes with his ability to walk.  (AR 60.)  Southgate's

sister, who stated that she sees Southgate "[p]retty much daily," testified at the hearing that

Southgate suffers from "agonizing back pain."  (AR 69.)

Most importantly, the record contains many medical records indicating that

Southgate suffers from spondylosis and spondylolisthesis of the lumbar spine, causing

significant low back pain.  (*See, e.g.*, AR 984, 989, 1058, 1479, 1492–98, 1560–67,

1569–70, 1595–1600.)  For example, a November 2012 MRI of Southgate's lumbar spine

showed "spondylolysis at the L5 level, some facet arthritis bilaterally at L5–S1, but no

significant central or foraminal stenosis."  (AR 1494.)  This MRI was later described by Dr.

Matthew Zmurko, the orthopedic physician who performed "multilevel cervical diskectomy

and fusion" surgery on Southgate, as follows: "[Southgate] had MRI and radiographic

studies in the fall/winter of 2012 which showed an L5-S1 spondylolisthesis with some

foraminal narrowing, but good preservation of disk space height."  (AR 1495.)  A December

2012 treatment note from Dr. Zmurko states that Southgate reported that his back pain was

"the most disabling problem at the present time."  (AR 1492.)  The note explains that the

pain is "a constant achy pain across the back," made worse by activity, and is about a 3/10

on average and a 9/10 at its worst.  (*Id.*)  An April 2013 treatment note from Dr. Zmurko

again states that "most of his discomfort is in his back."  (AR 1495.)  The note further states

that the back pain "is limiting [Southgate's] activities of daily living."  (*Id.*)  A June 2013

treatment note from Dr. Zmurko states that a transforaminal epidural steroid injection done

in May 2013 provided some relief for Southgate's leg pain but did not help with his back

pain.  (AR 1497.)  Dr. Zmurko stated that Southgate had recently been treated in the

emergency department due to "persistent back pain."  (*Id.*)  Dr. Zmurko further stated that

he had reviewed "multiple radiographs of [Southgate's] lumbar spine, and he does appear to

have had the spondylolisthesis for several years."  (*Id.*)  A September 2013 treatment note

prepared by PA Delaportas Grigorios of the Tilley Spine Institute lists as one of Southgate's

two "[a]ctive [p]roblem[s]" "[l]ow back pain radiating to both legs," and states that

Southgate's "symptoms have worsened to the point that his pain is now present every day

and fluctuates between 7/10 at its best and 10/10 at its worst," with walking and standing

aggravating his symptoms.  (AR 1560.)  Finally, a December 2013 treatment note from

Rutland Regional Medical Center indicates that Southgate was hospitalized for three days

for an "acute flare of chronic back pain."  (AR 1595.)

In general, an ALJ's failure to make an explicit finding of a severe impairment at step

two, where (as here) substantial evidence supports the presence thereof, does not in and of

itself require remand.  *See Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. May 2,

2013) (finding alleged step-two error harmless because ALJ considered impairments during

subsequent steps); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003)

(same).  However, where the omitted impairment was not accounted for in the ALJ's RFC

determination, or in other words, where the ALJ's step-two error prejudiced the claimant at

later steps in the sequential evaluation process, remand is required.  *See, e.g.*, *Hamilton*

*v.Colvin*, 8 F. Supp. 3d 232, 242 (N.D.N.Y. 2013) (ALJ's step-two error not harmless where

there was "no indication in the decision that the ALJ considered the impact of Plaintiff's

carpal tunnel syndrome on his ability to perform work-related functions"); *Elliott v. Comm'r*

*of Soc. Sec.*, Civil No. 09–1195–HA, 2011 WL 1299623, at *4 (D. Or. Mar. 31, 2011) ("The

general proposition that failures at step two may be harmless if the ALJ discusses the impairments and assesses limitations as a result of that impairment, . . . underscores the significance of the error in this case—the ALJ failed to adequately discuss the impairments at issue, and a determination as to whether plaintiff's limitations were fully assessed in connection with these impairments is impossible to ascertain."); *Sarver v. Comm'r of Soc. Sec.*, No. 07–11597, 2008 WL 3050392, at *14 n. 7 (E.D. Mich. July 28, 2008) ("Admittedly, in some instances an improper Step Two omission serves to invalidate the entire decision.").

Here, it is unclear how significant the ALJ considered Southgate's back pain to be, and this impairment does not appear to have been adequately accounted for in the ALJ's RFC determination.  Although, as the Commissioner points out (*see* Doc. 15 at 18), the ALJ referenced Southgate's back pain in determining whether Southgate had an impairment meeting or medically equaling Listing 1.04 and later in his RFC analysis while discussing the treatment notes of Dr. Rosmus (*see* AR 29, 33), these were just references in passing. As stated above, the ALJ made no mention of Southgate's back pain within his step-two analysis of severe impairments, despite discussing many other less significantly limiting impairments.  (*See* AR 27–29.)  Notably, the ALJ discussed in some detail several "non-severe" impairments at step two–including a traumatic brain injury, high cholesterol, and obstructive sleep apnea–explaining why he found them not severe but stating that he nonetheless considered them in determining Southgate's RFC.  (AR 27.)  Yet the ALJ said nothing about Southgate's back pain.  (*Id.*)  The error could be considered harmless had the

ALJ materially discussed and accounted for limitations caused by Southgate's back pain elsewhere in the decision, but merely mentioning it in passing is insufficient.

###    C.    Depression

In addition to failing to consider Southgate's back pain at step two of the sequential analysis, the ALJ made inconsistent statements about Southgate's depression, first finding it to be a "severe" impairment and then explaining why it was "nonsevere."  (AR 27–28.)  Specifically, the ALJ initially listed Southgate's depression as one of three "severe impairments" (AR 27), and then later stated: "[Southgate's] medically determinable mental impairment of depression does not cause more than minimal limitation in [Southgate's] ability to perform basic mental work activities and is therefore nonsevere."  (AR 28.)  It is unclear from the rest of the opinion whether the ALJ found Southgate's depression to be severe or non-severe.

The ALJ's step-two error regarding Southgate's depression could be considered harmless if there was little or no evidence indicating that Southgate's depression was a debilitating impairment.  But the record reveals that, in March 2012, an examining consultant, psychologist Dr. Craig Knapp, opined that Southgate's depression would "likely affect his performance at work due to low motivation and energy level."  (AR 1309.)  And in April 2012 and June 2012, respectively, non-examining agency consultants Dr. William Farrell and Dr. Thomas Reilly opined that Southgate had a "[s]evere" affective disorder.  (AR 104, 120.)  Moreover, a September 2010 treatment note from Rutland Regional Medical Center includes a diagnosis of depression with suicidal ideation with a plan to transfer Southgate to psychiatry.  (AR 906.)  The note states: "[Southgate] was complaining

of depression while hospitalized and was seen by Social Work and was felt to be a significant suicide risk, as [he] was unwilling or unable to contract for safety." (*Id.*)  The ALJ's discussion of Southgate's depression neglects to reference these medical opinions and treatment notes.  (*See* AR 27–28.)

Because it is not the role of the court to re-weigh the evidence, and because it is unclear whether the ALJ would have made the same RFC determination if Southgate's back pain and depression were properly considered at step two, I recommend remanding for the ALJ to specifically address these impairments, including the relevant evidence discussed above.  *See, e.g.*, *Kohler v. Astrue*, 546 F.3d 260, 268 (2d Cir. 2008) (remanding due to ALJ's failure to evaluate severity of mental impairment, and stating that it "is not clear whether the ALJ would have arrived at the same conclusion regarding [claimant's RFC] . . . had he adhered to the regulations").

## II.    Analysis of Treating Physician and Agency Consultant Medical Opinions

I also find that the ALJ erred in his analysis of the medical opinions.  Under the treating physician rule, a treating physician's opinions must be given "controlling weight" when they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Even when a treating physician's opinions are not given controlling weight, the regulations require that the ALJ consider several factors—including the length of the treatment relationship, the frequency of examination, whether the opinions are supported by relevant evidence and consistent with the record as a whole, and whether the physician is a specialist in the medical area addressed

in the opinions—in determining how much weight they should receive.  *Id.* at §§ 404.1527(c), 416.927(c); *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008).  In addition, the regulations provide that the ALJ "will always give good reasons in [his] . . . decision for the weight [he] give[s] [to the claimant's] treating source's opinion."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Schaal v. Apfel*, 134 F.3d 496, 503–04 (2d Cir. 1998).

Southgate started seeing Dr. Rosmus in around September 2010 (*see* AR 899), with Dr. Rosmus treating Southgate's various medical issues, including chronic neck and back pain, heart problems, sleep issues, and depression, among other ailments (*see, e.g.*, AR 1187, 1197, 1202, 1209).  Throughout their treatment relationship, Dr. Rosmus prescribed medications, including narcotic pain relievers, for Southgate, and referred Southgate to specialists for diagnoses and treatment.  (*Id.*)  In a June 2013 letter "to whom it may concern," Dr. Rosmus stated that Southgate has chronic cervical and low back pain, secondary to spondylosis, cardiovascular problems, and chronic depression.  (AR 1431.)  Dr. Rosmus opined: "Due to these multiple illnesses, . . . Southgate is permanently and totally disabled.  I have recommended that he apply for . . . total disability."  (*Id.*)  Approximately five months later, in November 2013, Dr. Rosmus completed a MSS regarding Southgate's functional limitations (AR 1569–74), opining that Southgate is significantly limited by neck and back pain, and stating: "[b]ecause of chronic orthopedic and cardiovascular problems, I do not feel that Mr. Southgate is able to engage in gainful full-time employment" (AR 1574).  Dr. Rosmus further stated that, on a full-time sustained basis, Southgate is limited to lifting five pounds frequently and 10 pounds occasionally, standing/walking for 30 minutes at a time and for three to four hours in a day, never

reaching overhead, occasionally reaching out in front, and frequently handling and

fingering.  (AR 1572.)  Dr. Rosmus also opined that Southgate needs to lie down for 30

minutes to one hour one to two times daily to alleviate pain symptoms.  (*Id.*)

The ALJ gave "limited weight"[2] to Dr. Rosmus's opinions for several reasons.  First,

the ALJ stated that Dr. Rosmus is a family practice doctor and not an orthopedist,

cardiologist, or psychiatrist.  (AR 32.)  Though true, Dr. Rosmus is also the doctor primarily

responsible for treating Southgate's chronic pain, Southgate's most serious impairment, and

as part of that treatment, Dr. Rosmus referred Southgate to numerous specialists, whose

reports Dr. Rosmus then considered in treating and prescribing medication for Southgate.

(*See, e.g.*, AR 1184–1213, 1314–20, 1322, 1384–1400, 1412, 1432–78, 1569–71.)  Given

these facts, this factor does not support giving less weight to Dr. Rosmus's opinions.

Second, the ALJ stated that Dr. Rosmus's opinions are unsupported by his own

treatment notes and objective testing showing normal findings.  (AR 32–33.)  In making this

finding, the ALJ relied in part on cardiology records which indicate that Southgate's

cardiovascular conditions were stable on medications during the relevant period.  (AR 32.)

Accepting this as true, however, Dr. Rosmus did not base his opinions regarding

Southgate's limited ability to function on Southgate's cardiovascular condition, but rather

on Southgate's "pain symptoms" (AR 1572), which mostly derive from his back and neck

pain (AR 1569–70).  Regarding Southgate's back and neck pain, the ALJ discussed medical

records showing generally mild clinical findings, as well as periodic and temporary

---

[2]  The ALJ first stated that he gave "limited weight" to Dr. Rosmus's opinions (AR 32), and later stated that he gave "little weight" to those opinions (AR 34).

improvement in symptoms.  (AR 32–33.)  But these findings are not necessarily inconsistent

with Dr. Rosmus's opinion that Southgate suffered from chronic back and neck pain.  (*See*

AR 1570–71.)  Dr. Rosmus believed that Southgate's complaints of pain were credible and

not exaggerated, and thus prevented him from performing sustained work activities on a

permanent basis.  (*See* AR 1571–72.)  Dr. Rosmus's opinion on this matter is entitled to

significant consideration, given that he was Southgate's treating physician.  *See* 20 C.F.R.

§ 404.1527(c)(2) ("Generally, we give more weight to opinions from your treating sources,

since these sources are likely to be the medical professionals most able to provide a detailed,

longitudinal picture of your medical impairment(s) and may bring a unique perspective to

the medical evidence that cannot be obtained from the objective medical findings alone or

from reports of individual examinations[.]").  Moreover, the ALJ appears to have

improperly substituted his own interpretation of the objective medical evidence for that of

Dr. Rosmus's.  *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir 1998) ("[I]t is well-settled

that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. .

. . [W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose

between properly submitted medical opinions, he is not free to set his own expertise against

that of a physician who [submitted an opinion to or] testified before him.") (all but first

alteration in original) (internal quotation marks omitted).

Third, the ALJ found that Dr. Rosmus's opinions are inconsistent with those of other

medical providers, as well as with Southgate's reported activities of daily living.  (AR

33–34.)  But no other medical doctor saw Southgate on as frequent a basis as Dr. Rosmus,

17

who appears to have had the most significant treatment relationship with Southgate.  And no

treating medical doctor questioned either Dr. Rosmus's opinions or Southgate's complaints

of physical pain.  Although treating psychologist Dr. Steven Mann stated in a February 7,

2013 Psychological Evaluation that Southgate presented with "an intense disability focus,

symptom amplification[,] and somatization" (AR 1555), Dr. Mann is a psychologist and

thus is best qualified to give an opinion on Southgate's mental rather than physical

impairments.  Of note, Dr. Mann believed that Southgate had significant mental problems,

recording for example in a February 21, 2013 treatment note that, on mental status

examination, Southgate's attitude was guarded and hostile, his mood irritable, his affect

constricted, his thought process tangential, his thought content paranoid, and his insight and

judgment poor.  (AR 1557–58.)  Dr. Mann diagnosed Southgate with "schizophreniform

disorder,"[3] "severe social isolation," and "significant employee/employer relationship

problems, chronic"; and assigned a Global Assessment of Functioning (GAF)[4] score of 52 to

Southgate, which indicates "[m]oderate symptoms (e.g., flat affect and circumstantial

speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school

functioning (e.g., few friends, conflicts with peers and co-workers)," *DSM-IV*, at 32 (4th ed.

2000).  (AR 1558.)  Dr. Mann also referred to Southgate's mental impairment as a "chronic

---

[3]  "Schizophreniform disorder" is "a disorder with essential features that are identical with those of
schizophrenia, with the exception that the duration including prodromal, active, and residual phases is shorter
than [six] months."  *Stedman's Medical Dictionary* 260570 (27th ed. 2000) (Westlaw).

[4]  "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking
the clinical progress of individuals [with psychological problems] in global terms.'"  *Kohler*, 546 F.3d
at 262 n.1 (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV")*, at 32 (4th ed. 2000).

psychopathology, which has strong elements of antisocial personality disorder."[5]
(AR 1559.)  Thus, although Dr. Mann questioned Southgate's complaints of severe physical pain, he believed Southgate had a serious mental impairment which may have contributed to his physical symptoms.

Regarding Southgate's activities of daily living, the ALJ's representation that they are robust (*see* AR 31) is unsupported.  Southgate is indeed able to live on his own, preparing his own meals and taking care of his personal care needs, but he nonetheless does very little on a daily basis and appears to do nothing on a sustained or continuous basis. (*See* AR 286–306.)  In a February 2012 Function Report, Southgate stated that most days, he gets up, lets the dog in and out, takes his medications, sits in his recliner, and tries to stay as calm and comfortable as possible.  (AR 296.)  He sometimes visits his father; and he tries to walk but gets very tired and weak.  (AR 296.)  Likewise, at the administrative hearing, Southgate testified that, on a typical day, he lets the dog out, tries to get comfortable, and eats.  (AR 49.)  Contrary to the ALJ's finding (AR 34), Southgate's limited daily activities support, rather than are inconsistent with, Dr. Rosmus's opinions.

---

[5]  In his initial January 3, 2013 Psychological Evaluation of Southgate, Dr. Mann stated:

Southgate is chronically mentally ill within the setting of multiple chronic pain complaints, that include[] cervicalgia[] and low back pain.  There is a very significant history of alcoholism that is not in remission.  There is significant evidence of an addiction disorder that may have played a large role in alcohol[-]induced psychosis in [his] 20s and 30s.  It is also possible that [his] psychotic disorder was independent of his severe alcoholism.

(AR 1548.)  Dr. Mann also found "significant findings of severe problems in interacting with others and establishing common adult milestones," and stated that he was not surprised that Southgate was 48 years old and living with his father.  (AR 1549.)

Instead of relying on Dr. Rosmus's opinions, the ALJ gave "substantial weight" to the opinions of the non-examining agency consultants, including Drs. Francis Cook and Leslie Abramson, stating that these opinions are "consistent with the totality of the medical evidence on record."[6]  (AR 34.)  Generally, where there are conflicting opinions between treating and consulting sources, as there are here between the opinions of Dr. Rosmus and the agency consultants, the "consulting physician's opinions or report should be given limited weight."  *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990).  This is particularly true where the consultant did not examine the claimant and made their opinions without considering the relevant treating source opinions.  *See Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990) ("The general rule is that . . . reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability.") (internal quotation marks omitted); *Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011) (where it is unclear whether consultant reviewed all of claimant's relevant medical information, consultant's opinion is not supported by evidence of record as required to override treating physician opinion).  Here, not only did agency consultants Drs. Cook and Abramson not examine Southgate, but they rendered their opinions in April and June 2012, respectively, prior to a significant amount of evidence–including Dr. Rosmus's November 2013 MSS and the November 2012 MRI of Southgate's spine–were added to the record.  (See AR 89–90, 121–23, 1479, 1569–74.)

---

[6]  The ALJ did not, however, give substantial weight to the particular opinions of agency consultants Drs. Farrell and Reilly, respectively, that Southgate was able to sustain concentration, persistence, and pace in only "low stress contexts" and would experience "episodic disruption to sustained concentration and pace due to depressive disorder features."  (AR 91, 124.)

For these reasons, the ALJ erred in his analysis of the medical opinions, failing to give good reasons for affording limited weight to the opinions of treating physician Dr. Rosmus and affording too much weight to the opinions of the agency consultants who neither examined Southgate nor considered the relevant evidence including Dr. Rosmus's opinions.

## III.    Remaining Claims

Because a remand for further proceedings is warranted due to the ALJ's step-two errors and failure to properly analyze the medical opinions, the Court need not consider Southgate's additional arguments or the Commissioner's responses.  On remand, all severe impairments will be identified and addressed by the ALJ; the treating physician opinions will be reconsidered; and the ALJ will make a new RFC determination, incorporating the appropriate physical and mental limitations therein.

## IV.    Remand for Further Proceedings or for a Calculation of Benefits

Finally, Southgate asks that the matter be remanded for a calculation of benefits, rather than for further proceedings.  In cases where there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision," reversal for a calculation of benefits may be appropriate.  *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999).  Courts have reversed and ordered that benefits be paid when the record provides persuasive proof of disability and a remand for further proceedings "would serve no purpose."  *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980).  Where, however, there are gaps in the administrative record or the ALJ has applied an improper legal standard, it is more appropriate to remand for further proceedings and a new decision.  *Rosa*, 168 F.3d

21

at 82–83; *see also Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).  Here, it cannot be said

that a remand for further proceedings would serve no purpose.  Once the ALJ properly

analyzes the severity of Southgate's back pain and depression at step two and gives more

weight to Dr. Rosmus's medical opinions, a new RFC determination will likely require

further testimony from a VE about what, if any, jobs Southgate can do and whether they

exist in significant numbers in the national economy.  Accordingly, I recommend remanding

for further proceedings rather than for a calculation of benefits.

### <u>Conclusion</u>

For these reasons, I recommend that Southgate's motion (Doc. 9) be GRANTED, in

part; the Commissioner's motion (Doc. 15) be DENIED; and the matter be REMANDED

for further proceedings and a new decision in accordance with this ruling.

Dated at Burlington, in the District of Vermont, this 9th day of October, 2015.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c).  Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision."  *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).